Filed 1/26/23  In re Anthony P. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re ANTHONY P., a Person Coming Under the Juvenile Court Law. | B313193 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>D.T.,<br><br>Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK22208) |

APPEAL from orders of the Superior Court of Los Angeles County, Robin R. Kesler, Juvenile Court Referee.  Affirmed.

Cristina Gabrielidis, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Tracey Dodds, Deputy County Counsel for Plaintiff and Respondent.

———————————————

D.T. (mother) appeals from juvenile court orders denying her Welfare and Institutions Code[1] section 388 petition and terminating parental rights to her son, Anthony P. Mother contends the juvenile court erred by denying her section 388 petition because she demonstrated both changed circumstances and that reinstating her reunification services was in Anthony's best interests. She further contends that the juvenile court erred in terminating parental rights because the parental-benefit exception to adoption (§ 366.26, subd. (c)(1)(B)(I)) applied, and the Los Angeles County Department of Children and Family Services (DCFS) conducted an inadequate inquiry pursuant to California law implementing the Indian Child Welfare Act (ICWA) (§ 224.2). We find no error, and thus we will affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Detention (March 2017).

Mother and Alexander P. (father) began dating when they were 14 and 15 years old, respectively. Mother became pregnant with Anthony 10 months later, and she dropped out of high school after his birth in June 2015. Mother and Anthony lived at times with father's family or with the maternal grandmother; at other times, mother lived at a homeless shelter and Anthony stayed with the paternal grandparents.

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

2

In March 2017, DCFS received a report that father had assaulted mother. A social worker interviewed mother, who reported that since Anthony's birth, father " 'hits me all the time,' " slapping, socking, and pinching her. The maternal grandmother gave a similar report, saying that mother had bruises on her arm, face, back, and leg. Maternal grandmother said she had tried to help mother, but she could not have father in her house because he had stolen from her, as well as from the maternal great-grandmother and their church.

Father accused mother of using drugs and denied abusing her, suggesting that mother's injuries might have been self-inflicted. He admitted using methamphetamine in the past and currently smoking marijuana, but he denied using drugs around Anthony. Father had a juvenile criminal history and was currently on probation.

In March 2017, Anthony was detained from mother and father and placed with Leticia I., the sister of maternal grandmother's husband. Mother, who was still a minor, was detained from her own parents and placed in a group home. Mother said she was relieved Anthony was not with father but was afraid for Leticia and maternal grandmother because " 'I know how he [father] is.' "

## II.    Petition; jurisdiction and disposition hearing (June 2017).

DCFS filed a section 300 petition in March 2017. As subsequently amended, the petition alleged that Anthony was a dependent child pursuant to section 300, subdivision (b) because mother and father engaged in domestic violence in Anthony's presence (count b-1), and both parents used marijuana while caring for Anthony, placing him at risk of harm (counts b-2, b-3).

3

Simultaneously, DCFS filed a separate petition alleging that mother was a dependent child because the maternal grandmother was unable or unwilling to care for her.

At the March 2017 detention hearing, the court detained Anthony from mother and father, who were ordered to stay away from each other. The court ordered the parents to participate in various services and to drug test.

Mother ran away from her group home in April 2017, returning in late May 2017. That month, a multidisciplinary assessment team reported that Anthony was comfortable with Leticia and looked to her for comfort and security. He frequently woke up agitated during the night, but would fall back to sleep if Leticia picked him up and hugged him.

In June 2017, mother said she and father had always had domestic violence issues, and father last hit her in March. They were no longer in a relationship, and mother wanted a restraining order against him. She acknowledged using marijuana in the recent past.

At the June 2017 jurisdiction hearing, the parents pled no contest to an amended section 300 petition. The court declared Anthony a dependent child and removed him from his parents' custody, placing him with Leticia. Mother was granted monitored visits and ordered to randomly drug test and to participate in a domestic violence support group, a parenting class, and individual counseling.

## III.    Six-month review (December 2017).

With her family's support, mother entered a drug treatment program in Tijuana, Mexico in July 2017.[2]  Prior to her enrollment, mother had sporadic monitored visits with Anthony, during which she was "attentive," changing Anthony's diaper and positively interacting with him, including playing with and hugging him.  Mother stopped visiting Anthony when she began her program.

In December 2017, the court granted both parents further reunification services, finding that they had made significant progress resolving the problems that led to Anthony's removal.

## IV.    Twelve-month review (May 2018).

In January 2018, mother ran away from her drug rehabilitation program and returned to the United States to be with father.  She refused to return to the program, saying that she wanted to be with her son and complete her coursework in Los Angeles.  Upon her return, she enrolled in adult school, as well as drug rehabilitation, domestic violence, and parenting programs.  As of April 2018, she had completed nine weeks of those programs, and had one random negative drug test, with several no-shows.

The social worker noted that mother was "very attentive, appropriate, loving and caring with Anthony" during monitored visits, and it appeared mother and Anthony had "bonded." Anthony was "always happy to see his mom"; mother brought

---

[2]    Maternal grandmother reportedly funded mother's program, believing mother needed to get away from the abuse she had endured.

them books to read together, worked with Anthony on his speech delays, and was otherwise alert to Anthony's needs.  However, mother and father had continued to see one another, and father continued to "become very upset and angry at times when things [were] not going his way."

In May 2018, the court continued reunification services and granted mother four-hour monitored visits.  Because the parents allegedly continued to see each other and were dishonest with the social worker, the court reiterated that the stay-away order remained in place and that couples counseling would be required if they planned to reunite.  Mother reported that she had moved into her own apartment, and maternal grandmother recently had been approved to monitor her visits with Anthony.

## V.    18-month review; return of Anthony to mother's physical custody (December 2018).

In August 2018, DCFS indicated mother had not yet completed a full drug program, but she had tested negative on all nine drug tests administered over the preceding several months.  Mother was working and had attended Anthony's recent educational assessment.  By September 2018, mother had completed her parenting and domestic violence courses and her individual counseling.

At the 18-month review hearing in December 2018, the court ordered Anthony placed with mother and issued a restraining order protecting mother from father.

## VI.   Mother's continued contact with father; further petition and detention (March 2020).

In April 2019, the social worker visited Anthony at mother's apartment, which was clean, furnished, and had plenty

6

of food and items for Anthony's care. Mother was "vigilant" in parenting Anthony, applying a "warm, loving, but a firm parenting style." Anthony "listened and obeyed" mother. They were bonding, and Anthony appeared at ease in the home and said "yes" when asked if he felt safe and wanted to stay with mother. Maternal relatives were supportive. Mother had enrolled in an outpatient drug program, but over the preceding three-month period had appeared for only four of 10 drug tests, testing negative at each. Father was incarcerated in state prison for gun possession and vehicle theft.

In June 2019, the court declined to close the case because mother had missed a number of drug tests. The matter was continued for an additional three months, to September 2019, and then again to March 2020.

In December 2019, mother reported to police that father had walked into her apartment unannounced and demanded her car keys. He left when she threatened to call the police. Four days later, the police again responded to mother's apartment in response to a neighbor's call regarding a young couple arguing. The neighbor reported seeing a young man at mother's home and walking outside with a child several times per week. Mother denied these allegations, claiming to report all of father's visits to police. However, father, who was then on probation, told his probation officer that he was babysitting Anthony.

Days later, the social worker visited mother's apartment unannounced after the maternal great-grandfather reported that father had hidden in mother's closet during prior check-ins. Mother denied that anyone else was in the apartment other than Anthony and herself. She led the social worker to the closet, pulled her teenage brother out, and told the social worker that he

was the only one in the closet.  The social worker looked inside and "saw father's feet, his legs (which were slim and hairy), and his shoes inside the closet."  After the person refused to leave the closet, the social worker asked Anthony whether father was in the closet.  Anthony closed the closet door so the person inside could not see him, and he also made sure mother did not see him.  He then noddled "yes."[3]  Mother continued to deny that father was there.  Feeling unsafe, the social worker left the home.  Later, police told the social worker that mother reported father had broken her windshield.

In February 2020, mother reported to the police that father had come to Anthony's school, snatched her keys out of her hand, and stolen her car.  Father was apprehended and arrested.

The social worker reported that, as of February 2020, Anthony appeared in good health and had bonded with mother.  However, he had "reverted to being quiet [and] angry with mom" and had resumed having tantrums.  Mother missed the majority of her drug tests between September 2019 and February 2020, although she tested negative at each of the six scattered tests at which she appeared.

In March 2020, DCFS filed a subsequent petition pursuant to section 387, alleging that mother had disobeyed prior court orders by allowing father to frequent her home and have unlimited access to Anthony.  Anthony was detained from mother and returned to Leticia's custody.

At a March 10, 2020 detention hearing, the court told mother it appeared father "comes and goes whenever he wants,

---

[3]     When later asked whether father was in the closet, Anthony shook his head both yes and no.

8

and . . . he has been staying at your house contrary [to] court orders." While the court believed mother did not harm Anthony physically and was not using drugs, it said that "allowing a person who the court has found to present as a safety risk to your son and to you in your home and letting him have contact with [Anthony] . . . is putting your son in a dangerous situation." Further, if mother was "afraid of father, [or] worried that he's going to harm you, then you need to think about moving out and getting a confidential address. . . . [Father] is relentless. And unless you act on it, he's going to keep looking for you, and you have let him." The court granted mother monitored visitation and ordered her to reenroll in individual counseling and parenting classes and to drug test.

## VII. Further adjudication and disposition; denial of further reunification services (July 2020).

In April 2020, Leticia reported that mother and father were " 'always together' " and that the relationship between them was " 'toxic.' " She said father was very controlling of mother and continued to hit her. In June 2020, the maternal grandmother reported that father was frequently at mother's apartment and mother was six months pregnant with father's child. Mother continued to miss many drug tests.

In July 2020, the court sustained the section 387 petition, removed Anthony from mother's custody, denied mother further reunification services, and scheduled a section 366.26 hearing. Although mother's "regular[] and consistent" visits showed she "clearly ha[d] a bond" with Anthony and that Anthony was "attach[ed]" to her, the court said it needed to address permanency. The court did not accept mother's assertions that father was not in her home or the father of her new child.

9

The October 2020 section 366.26 report noted that Leticia and her husband were closely bonded with Anthony and wished to adopt him. Five-year-old Anthony said he felt safe and loved in Leticia's home. He looked to Leticia and her husband for care and comfort, and he appeared closely bonded to them and their three-year-old son. Leticia continued to facilitate in-person and phone visits with mother.

In November 2020, mother filed a section 388 petition requesting that Anthony be placed with the maternal grandmother or great-grandmother. The court denied the petition, stating that Anthony had been in his present placement for significant periods, and the grandmothers had not previously sought placement.

In January 2021, DCFS reported that mother had not made herself available for an interview. Leticia reported that mother's visits with Anthony went well, but "sometimes the child cries as he does not want to go on visits."

In February 2021, the court denied mother's request for a bonding study, stating that the request was untimely and a bonding study would not assist the court because DCFS's reports adequately documented mother's relationship with Anthony. The court also denied mother's request that Anthony testify at the 366.26 hearing, finding testifying could be emotionally detrimental to him in light of his young age, but it ordered DCFS to interview Anthony about his wishes.

In March 2021, the social worker reported that she had spoken to Leticia regarding Anthony's visits with mother. Those visits were monitored by the maternal grandmothers, and thus Leticia could not speak to how they went. Leticia said, however, that while Anthony sometimes wanted to visit mother, at other

times she had to bribe him with a toy.  For the first two months, Anthony cried when he was dropped off, concerned that Leticia might not pick him up.  Further, during phone visits with mother, Anthony was unusually disobedient with Leticia.

The maternal grandmother reported to the social worker that she monitored visits every Sunday, and that mother and Anthony had a "great connection."  Mother usually visited for six hours.  Anthony talked and played with mother and appeared happy.  Mother was attentive with Anthony, cooking for him, and putting him in his pajamas when he was ready to go.  Anthony would ask where certain toys were at mother's home, and mother reassured him that she had them.  When the visit was almost over, Anthony would ask if he could stay.  Maternal great-grandfather also observed visits between mother and Anthony, confirming to the social worker that mother treated Anthony well, cooking, bathing, and dressing him.  Anthony loved his mother, and would kiss and hug her, and would cry at the end of visits because he wanted to stay.  Maternal great-grandmother, who also regularly monitored visits starting in March 2020, described mother as patient with and dedicated to Anthony, feeding and bathing him and talking to him.  At the end of visits, Anthony would cry and ask to stay.

The social worker asked Anthony, who was then five years old, about adoption, but he did not understand the concept.  He said he wanted to stay with "Lety" (Leticia).

In March 2021, mother filed a second section 388 petition, requesting that Anthony be returned to her care or that her reunification services be reinstated.  She contended that circumstances had changed because she had been participating in domestic violence and parenting classes, which she expected to

complete in April, and placing Anthony in her care was in his best interests because they were closely bonded. The court denied mother's petition without a hearing, finding there was no new evidence or changed circumstances.

In May 2021, mother filed a third section 388 petition, asserting that she had completed her classes and consistently visited Anthony.

## VIII. Combined section 388 and termination hearing (May 2021).

On May 27, 2021, the juvenile court held a combined hearing on mother's section 388 petition and DCFS's request to terminate parental rights. After hearing argument, the court denied the section 388 petition, finding that mother had not demonstrated a significant change in circumstances or that it was in Anthony's best interests to be returned to her custody.

The court then permitted mother to testify by videoconference regarding termination of parental rights. Mother testified that after Anthony was detained for the second time, she resumed weekly visits with him every Saturday, and a Zoom call either Wednesday or Friday. At the beginning of visits, Anthony would run to mother and hug her. Anthony would tell mother he missed her and ask how her week was. They would cook breakfast and bake together, and mother would help Anthony with his homework. Mother said she had spoken to Anthony's teacher and was involved with his medical decisions. At the end of visits, Anthony would become sad, ask to stay longer, and hide his shoes. Mother therefore asked that Anthony be placed in a legal guardianship so she could continue to see him. She believed that severing their contact would be detrimental to Anthony because he had a strong bond with her

12

and with his baby sister; further, she said, she believed that "emotionally and, you know, mentally, . . . [it will] really mess up his head by me not being in his life."[4]

At the conclusion of mother's testimony, counsel for DCFS argued that adoption was the preferred permanent plan when reunification with a parent was not possible, and that the parental-benefit exception applied only where the strength and quality of the parent-child relationship exceeded the benefit to the child a new family would confer. Counsel noted that the present case was more than four years old, and while there was evidence of a loving bond between mother and Anthony, his primary attachment was to Leticia, with whom he had lived for many years. DCFS therefore asked that mother's parental rights be terminated. Anthony's counsel joined in DCFS's argument.

Mother's counsel argued that the parental-benefit exception to adoption applied, and she therefore requested that Anthony be placed in a legal guardianship and mother granted continued visitation. Counsel noted that mother had visited regularly, and the visits were meaningful, substantial, and positive. Further, mother had taken on a parental role, cooking for Anthony, buying him clothing, and participating in his medical decisions. Counsel argued that terminating mother's parental rights therefore would be detrimental to Anthony because he was bonded to mother and loved her.

---

[4]     After mother finished testifying, her counsel sought to call maternal grandmother as a witness. The court refused to allow her to testify because it believed grandmother had been present during mother's testimony, contrary to the court's order, and thus mother's testimony had tainted grandmother's potential testimony.

The court found that Anthony was adoptable and the parental-benefit exception did not apply. It noted that mother had allowed father in her home in violation of court orders, and then "ma[de] Anthony lie to the social workers to indicate that father was not there," which the court said was "a lot for little kid." The court also found mother's testimony that father's presence in her home was without her consent was contradicted by disinterested witnesses and was not credible. Additionally, the court said, application of the exception required "daily contact and acting in the role of a parent," and "mother has not been doing that." Finally, the court believed that mother's statement that severing parental rights would be detrimental to Anthony was "an opinion without any facts behind it." The court therefore found that the parental-benefit exception did not apply, terminated mother's and father's parental rights, and designated Leticia as the prospective adoptive parent.

Mother timely appealed.

## DISCUSSION

### I. The juvenile court did not err by denying mother's May 2021 section 388 petition.

Mother contends that the juvenile court abused its discretion by denying her May 2021 section 388 petition seeking that her reunification services be reinstated or Anthony be returned to her care. We disagree.

Section 388 permits a parent to petition the juvenile court to modify any order based on changed circumstances or new evidence. To obtain the requested modification, the moving party must demonstrate by a preponderance of the evidence both a change of circumstance and that the proposed change of order is

14

in the child's best interests.  (§ 388; *In re Alayah J.* (2017) 9 Cal.App.5th 469, 478; *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.)

To obtain a hearing, the moving party must make a prima facie showing of both elements.  (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1504.)  The petition must be liberally construed in favor of granting a hearing, and the prima facie requirement is met if the facts alleged would sustain a favorable decision on the petition.  (*Id.* at p. 1505.)  "If it appears that the best interests of the child . . . may be promoted by the proposed change of order . . . the court shall order that a hearing be held." (§ 388, subd. (d).)

The change in circumstance must be such that the problem that brought the child into the dependency system has been removed or ameliorated; the change must therefore be significant or substantial.  (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 615.)  Circumstances must have changed and not be merely changing.  (*Ibid.*)  To determine whether this showing has been made, the court may consider the entire factual and procedural history of the case.  (*Id.* at p. 616.)  Whether to modify an order under section 388 rests in the juvenile court's discretion and will not be disturbed on appeal unless there has been a clear abuse of discretion.  (*In re Mickel O.*, at p. 616.)

On appeal, mother advances two separate, but interrelated, claims with respect to the denial of her May section 388 petition. First, she suggests that the juvenile court based its denial upon a misapprehension of the basis for denying mother's March 2021 section 388 petition.  Second, mother argues that her May 2021 petition was sufficient to warrant a hearing because she had

15

completed her domestic violence program and was deeply bonded with Anthony.  Mother is wrong on both scores.

When the court denied mother's May section 388 petition, it reasoned that it had already denied her March section 388 petition, and that mother's completion of programs was not a significant change in circumstances demonstrating that it was in Anthony's best interests to be returned to her.  Mother argues that the court was "confused" regarding the bases for its earlier decisions, erroneously believing that the reason underlying its November decision was, in fact, the reason underlying its March decision.  However, the court's decision did not address the reasons for its prior denials.  The colloquy that mother invokes occurred during her counsel's argument, at which point the court clarified with mother's counsel the bases for its prior rulings, correctly stating that the denial of the "original [November 2020]" petition was due to the lack of a prior placement request by maternal grandparents.  As such, the court did not mistake the bases for its prior orders.

Mother next argues that the court abused its discretion by denying her petition without a hearing because her completion of domestic violence and parenting courses was a sufficient change in circumstances.  Again, mother's contention lacks factual and legal support.  Mother had already completed domestic violence and parenting courses in September 2018.  Then, mother continued to see father in spite of protective orders, resulting in several reports, by neighbors and mother herself, of fighting and/or property damage.  Mother hid father from social workers when they came to visit the home, and she appeared to coax Anthony into telling social workers otherwise.  This resulted in Anthony's second removal from mother's custody and a second

16

order for mother to participate in services.  Consequently, the record is clear that the completed programs cited in mother's May 2021 petition were the second round of such programs, ordered after mother again became enmeshed with father despite having completed the first sequence of programming. Additionally, over the period that followed Anthony's second removal from mother's custody, there were several reports suggesting that mother was still in contact with father, including potentially having given birth to his new child.

Viewed in this light, we cannot say that the juvenile court abused its discretion in holding that mother's completion of further domestic violence and parenting classes did not constitute sufficient changed circumstances.  Considering, as we must, the trajectory of the entire four-plus year case, it was eminently rational for the court to conclude that mother's mere completion of this second round of coursework was not sufficiently substantial to require the conclusion that the problem which brought the child into the dependency system had been ameliorated.  (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 615; see *In re Elizabeth M.* (2018) 19 Cal.App.5th 768, 780 [juvenile court does not abuse discretion unless it acted " 'in an arbitrary, capricious or patently absurd manner that resulted in a miscarriage of justice' "].)

For several of the same reasons, the court did not abuse its discretion in further concluding that returning Anthony to mother's custody was not in Anthony's best interests.  Mother cites her steady visitation and "deep[] bond" with Anthony, and that she was not alleged to have abused Anthony.  But the juvenile court was not required to conclude that returning to mother's custody was in Anthony's best interests merely because

17

she and Anthony were "bonded" and she had not abused Anthony. Instead, it was well within its discretion to find that mother's continued association with father meant that Anthony could not safely be returned to her care.

Accordingly, the juvenile court's denial of mother's May 2021 section 388 petition was not an abuse of discretion.

## II. The juvenile court did not abuse its discretion by concluding that the parental-benefit exception did not apply.

Next, mother argues that the juvenile court erred when it found that the parental-benefit exception to adoption (§ 366.26, subd. (c)(1)(B)(i)) did not apply. Again, we disagree.

### A. Governing law and standard of review.

Section 366.26's express purpose is "to provide stable, permanent homes" for dependent children. (§ 366.26, subd. (b).) If the juvenile court has ended reunification services, adoption is the legislative preference. (§ 366.26, subd. (b)(1).) When the court finds by clear and convincing evidence the child is likely to be adopted, the statute mandates terminating parental rights and placing the child for adoption unless the parent can demonstrate an exception applies. (§ 366.26, subd. (c)(1); *In re Caden C.* (2021) 11 Cal.5th 614, 625 (*Caden C.*).)

One such exception is the parental-benefit exception, which applies if the harm from severing the parent-child relationship outweighs the benefit of placing the child in an adoptive home. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) To establish this exception, the parent must demonstrate, by a preponderance of the evidence, that termination would be detrimental to the child

18

in light of three statutory elements:  (1) regular visitation and contact with the child, (2) a relationship, the continuance of which would benefit the child, such that (3) terminating parental rights would be detrimental to the child.  (§ 366.26, subd. (c)(1)(B)(i); *Caden C.*, at p. 631.)  In assessing whether termination would be detrimental, "the [juvenile] court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home."  (*Caden C.*, at p. 632.)

The first element, regular visitation and contact, "is straightforward.  The question is just whether 'parents visit consistently,' taking into account 'the extent permitted by court orders.' "  (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)

The second element requires the court to "assess whether 'the child would benefit from continuing the relationship.' (§ 366.26, subd. (c)(1)(B)(i).)  Again here, the focus is the child. And the relationship may be shaped by a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  In evaluating this factor, "courts often consider how children feel about, interact with, look to, or talk about their parents."  (*Ibid.*)

The third element—whether termination would be detrimental to the child due to the relationship—requires the court to decide whether it would be harmful to the child to sever the relationship and choose adoption.  (§ 366.26, subd. (c)(1)(B); see also *id.*, subd. (c)(1)(D).)  In making this determination, a court must determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for

19

the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.)  In each case, then, "the court acts in the child's best interest in a specific way:  it decides whether the harm of severing the relationship outweighs 'the security and the sense of belonging a new family would confer.' [Citation.]  'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that,' even considering the benefits of a new adoptive home, termination would 'harm[ ]' the child, the court should not terminate parental rights.  [Citation.]  That subtle, case-specific inquiry is what the statute asks courts to perform:  does the benefit of placement in a new, adoptive home outweigh 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship with [the parent?]' " (*Id.* at pp. 633–634.)

In considering these issues, the parent's struggles with issues such as those that led to dependency are relevant only "to the extent they inform the specific questions before the court:  would the child benefit from continuing the relationship and be harmed, on balance, by losing it?" (*Caden C.*, *supra*, 11 Cal.5th at p. 638.)  As our Supreme Court has explained:  "[H]ow and how much the loss of a relationship with a parent may be harmful, how and how much that harm might be offset by a new family are complex questions not always answered just by determining how beneficial the child's relationship with the parent is.  Though there is no reason for a court to consider 'a second time' the same struggles in the same way, a parent's struggles with substance abuse, mental health issues, or other problems could be directly relevant to a juvenile court's analysis in deciding whether termination would be detrimental." (*Id.* at p. 639.)

20

Because the first two elements—whether the parent has visited the child consistently, and whether the relationship is such that the child would benefit from continuing it—are factual determinations, we review them for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at p. 639.)  The third element—whether termination of parental rights would be detrimental to the child—requires the court to engage in a "delicate balancing" and assess "the likely course of a future situation that's inherently uncertain."  (*Id.* at p. 640.)  This determination is inherently discretionary, and thus we review it for abuse of discretion.

### B.    Analysis.

#### 1.    Regular visitation.

Mother contends that the juvenile court did not properly apply the first prong of the statutory test—regular visitation— and we agree.  The section 366.26 hearing in this case took place on May 27, 2021, the same day our Supreme Court issued its decision in *Caden C.*, and thus neither the parties nor the juvenile court had the benefit of that decision.[5]  The juvenile court's statements on the record suggest that it found the exception did not apply, at least in part, because mother had not had "daily contact" with Anthony.  But daily contact is not required under *Caden C.*; what is required is "consistent[]" visitation and contact, to the extent permitted by court orders.

---

[5]    As a nonfinal case pending when *Caden C.* was issued, we presume, as the parties have, that *Caden C.* has retroactive effect.  (See, e.g., *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 24, 44 ["[T]he general rule [is] that judicial decisions are to be applied retroactively"].)

(*Caden C.*, *supra*, 11 Cal.5th at p. 632.)  The juvenile court therefore erred by requiring mother to demonstrate daily contact to satisfy the first prong of the parental-benefit exception.

The juvenile court's error as to the first prong is not dispositive of the applicability of the exception, however.  Instead, because mother bore the burden of the proof as to all *three* prongs of the statutory test (*Caden C.*, *supra*, 11 Cal.5th at p. 631), the error necessarily was harmless if the court applied the correct legal standard as to the second or third prongs and its findings were supported by substantial evidence.  We turn therefore to those prongs.

### 2. Benefit to Anthony from continuing the relationship.

To prove the second element, mother had to demonstrate that Anthony had "a substantial, positive, emotional" attachment to her, such that he "would benefit from continuing the relationship."  (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)  Mother contends the juvenile court misapplied this element because it focused on her failure to end her relationship with father and to occupy a "parental role" in Anthony's life, rather than on Anthony's bond with mother.  For the reasons that follow, we disagree.

Prior to *Caden C.*, many courts evaluating the parental-benefit exception considered whether a parent had acted in "a parental role" with regard to the child.  (E.g., *In re Dakota H.* (2005) 132 Cal.App.4th 212, 229 ["In order to overcome the statutory preference for adoption, the parent must prove he or she occupies a parental role in the child's life"]; *In re L. Y. L.* (2002) 101 Cal.App.4th 942, 954 ["[t]he parent must show he or she occupies a parental role in the child's life, resulting in a

significant, positive, emotional attachment from child to parent"].) Mother contends that *Caden C.* definitively rejected this approach to the parental-benefit exception, and she requests that we therefore remand this case so the juvenile court can reconsider her evidence under the correct standard. But as another appellate court recently has noted, the Supreme Court in *Caden C.* did not use the phrase "parental role" in any portion of its analysis (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1157), and while the focus of the second prong under *Caden C.* is on the benefit to the child of maintaining the parent-child relationship, the parent's failure to occupy a "parental role" can be highly relevant to that analysis (*ibid.* ["the strength and quality of the parent's relationship with the child, *including whether that parent has a parental role*, is a relevant consideration" under *Caden C.*], italics added).

Division One of this court considered a claim similar to mother's in *In re Katherine J.* (2022) 75 Cal.App.5th 303, 319–320 (*Katherine J.*).) There, a father challenged an order terminating parental rights, urging that the juvenile court misconstrued the second element of the parental-benefit exception to require that he occupy a "traditional parental role" in his daughter's life. (*Id.* at p. 318.) The Court of Appeal disagreed and affirmed. Although the juvenile court had found the father " 'ha[d] not occupied a significant parental role,' " it also "explained what it meant"—namely, that the "father's unresolved issues with substance abuse and violence had consistently destabilized [his daughter's] life for years, fatally compromising father's attempts to maintain a strong, positive emotional attachment with her." Because this finding was supported by substantial evidence, the appellate court held that

23

remand for further fact-finding was not appropriate.  (*Id.* at pp. 318–322.)

The court similarly concluded in *In re A.L.*, *supra*, 73 Cal.App.5th 1131.  There, the father challenged an order terminating parental rights, urging that the juvenile court erred "by failing to complete 'the complex task of reaching a detriment finding [and instead] merely relying on father's and the caretakers' [respective] parental role[s]." (*Id.* at p. 1155.)  The court disagreed, noting, in part, that nothing in the record suggested that the court's statements on the record were "intended to be a comprehensive recitation of the grounds for its decision." (*Id.* at p. 1156.)  Further, the court said, in assessing potential detriment, "it was proper for the juvenile court to consider whether, and the extent to which, the caregivers and [parent] occupied parental roles with the minor." (*Id.* at p. 1157.)  Because substantial evidence supported a conclusion that the benefits of adoption outweighed the harm from the loss of the relationship with the father, the juvenile court did not abuse its discretion in concluding that the parental-benefit exception did not apply.  (*Id.* at p. 1161.)

In the present case, although the court found that mother had failed to act in the role of a parent, it did not stop there—instead, as in *In re Katherine J.*, the court "explained what it meant."  Specifically, the court noted that mother had exposed Anthony to repeated domestic violence incidents between the parents, including father stealing mother's car keys, breaking her windshield, and removing her window screens.  The court also noted that mother had encouraged four-year-old Anthony not to tell the truth about father's presence in mother's closet, which

24

Anthony knew to be wrong. Being asked to lie to protect his parents was, the court said, "a lot for a little kid."

Nor did the juvenile court err by considering, in the context of the second prong, Anthony's likely continued exposure to domestic violence if his visits with mother were to continue. Under *Caden C.*, assessing whether " 'the child would benefit from continuing the relationship' " requires the juvenile court to consider a variety of factors, including the " 'the "positive" or "negative" effect of interaction between parent and child.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) A parent's continued struggles to make progress with the issues leading to dependency may be highly relevant to the parental-benefit exception: As our Supreme Court has explained, "[i]ssues such as those that led to dependency often prove relevant to the application of the exception" because "[a] parent's struggles may mean that interaction between parent and child at least sometimes has a ' "negative" effect' on the child." (*Id.* at p. 637.) Accordingly, it was appropriate for the juvenile court to consider the likelihood that Anthony would continue to be exposed to domestic violence between his parents in determining that, on balance, he would not benefit from continuing his relationship with mother.[6]

_____

[6] For this reason, we do not agree with mother that the juvenile court "made no analysis of the relationship Anthony had with Mother and whether it was beneficial to him, but rather, judged Mother for being in a domestic violence relationship with Father and putting her relationship with Father 'above their child.' " As we have described, the effect on Anthony of the domestic violence between mother and father was highly relevant to the relative benefit to Anthony of continuing his relationship

25

Because the juvenile court applied a correct legal standard in considering the second prong of the *Caden C.* analysis, we must affirm its finding that the parental-benefit exception did not apply unless we conclude that the evidence compelled a finding for mother as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7 [where the trier of fact has concluded that the party with the burden of proof did not carry the burden and that party appeals, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law"].) It did not. While there certainly was evidence of a loving bond between mother and Anthony, there also was evidence that, on balance, Anthony would not benefit from continuing the relationship. Unquestionably, Anthony was often happy to see mother, enjoyed his time with her, and became upset when it was time to end visits. But there was also evidence that Anthony was significantly affected by the violent relationship between mother and father. In February 2020—i.e., during the period Anthony was living with mother and there were reports of domestic violence incidents between mother and father—the social worker reported that Anthony had "reverted to being quiet [and] angry with mom" and had resumed having tantrums. After Anthony was returned to Leticia, he cried when she dropped him off to visit mother for the first several months, fearful that Leticia might not pick him up. Other times, Leticia had to bribe Anthony with a toy to get him to visit mother. And when the

with mother, and thus it was a proper basis for the court's decision.

26

social worker asked Anthony about permanency, he said he wanted to stay with Leticia.

It is apparent to this court that mother loves Anthony and made many positive changes in her life to regain custody of her son. It is also apparent that Anthony loves his mother and enjoys visits with her and his maternal grandparents. But "[a] biological parent who has failed to reunify with an adoptable child may not derail an adoption merely by showing the child would derive *some* benefit from continuing a relationship maintained during periods of visitation with the parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.) Instead, the parent must demonstrate that the child would, *on balance*, benefit from continuing the relationship. (*Caden C., supra,* 11 Cal.5th 637.) The juvenile court did not err by concluding that mother failed to make that showing here, and thus that the parental-benefit exception did not apply.[7]

## III. The juvenile court did not err by finding that DCFS made an adequate ICWA inquiry.

Both mother and father denied Indian heritage when DCFS interviewed them and again on their ICWA-020 forms. On the basis of these denials, the juvenile court found at the March 2017 detention hearing that it had no reason to know that Anthony was an Indian child, but it ordered the parents to keep DCFS, their attorneys, and the court aware of any new information relating to possible ICWA status.

---

[7] Having so concluded, we need not address whether the juvenile court properly concluded that the third *Caden C.* factor was unmet.

27

Although mother did not challenge the juvenile court's ICWA finding below, on appeal she urges that DCFS breached its duty of inquiry because it did not interview readily available extended family members, including maternal grandmother, maternal great-grandmother, paternal grandmother, and maternal and paternal aunts about possible Indian ancestry. She thus urges that the order terminating parental rights should be reversed and remanded for compliance with ICWA.

For all the reasons discussed in *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1005 (*Ezequiel G.*), we conclude that the juvenile court did not err in concluding that ICWA does not apply to this case. Stated briefly, there is no evidence in the present record that would support the conclusion that Anthony is an Indian child. Further, the juvenile court did not abuse its discretion in concluding that the agencies conducted an adequate inquiry. In reviewing a juvenile court's ICWA findings for abuse of discretion, the key question for a reviewing court is whether the ICWA investigation has reliably answered the question at the heart of the ICWA inquiry: Whether a child involved in a proceeding "is or may be an Indian child" (§ 224.2, subd. (a))— that is, whether he or she either (a) "is a member of an Indian tribe" or (b) "is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." (25 U.S.C. § 1903(4); see also § 224.1, subds. (a)–(b).) In other words, the focus of the court's analysis is not on the number of individuals interviewed, but on whether the agency's ICWA inquiry has yielded reliable information about a child's possible tribal affiliation. (*Ezequiel G.*, at p. 1009.)

As we have explained, " 'ICWA does not apply simply based on a child or parent's Indian ancestry.' " (*Ezequiel G.*, *supra*,

81 Cal.App.5th 1009, citing U.S. Dept. of Interior, Bureau of Indian Affairs, Guidelines for Implementing the Indian Child Welfare Act (Dec. 2016) (BIA Guidelines), p. 10 <https://www.bia.gov/sites/default/files/dup/assets/bia/ois/pdf/idc2 -056831.pdf> [as of July 29, 2022], archived at <https://perma.cc/5758-64CA>.)  Instead, "the statutory definition of 'Indian child,' . . . is based on the child's *political ties* to a federally recognized Indian Tribe, either by virtue of the child's own citizenship in the Tribe, or through a biological parent's citizenship and the child's eligibility for citizenship."  (Indian Child Welfare Act Proceedings, 81 Fed.Reg. 38795 (June 14, 2016) (BIA ICWA Proceedings), italics added.)  In other words, an Indian child is one with a *tribal affiliation*, not merely Indian ancestry.

"Tribal citizenship (aka Tribal membership) is voluntary and typically requires *an affirmative act* by the enrollee or her parent."  (BIA ICWA Proceedings, *supra*, 81 Fed.Reg. at p. 38783, italics added.)  Specifically, "Tribal laws generally include provisions requiring the parent or legal guardian of a minor *to apply for* Tribal citizenship on behalf of the child.  [Citation.] Tribes also often require an affirmative act by the individual seeking to become a Tribal citizen, such as the filing of an application.  [Citation.]  As ICWA is limited to children who are either enrolled in a Tribe or are eligible for enrollment and have a parent who is an enrolled member, *that status inherently demonstrates an ongoing Tribal affiliation*."  (*Ibid*., italics added; see also BIA Guidelines, *supra*, at p. 10 ["Most Tribes require that individuals apply for citizenship and demonstrate how they meet that Tribe's membership criteria."].)  Because membership in an Indian tribe therefore requires that an individual or his or

her parent *apply* for tribal membership, a child's parents will, in most cases, be the best source of information for determining whether a child is an Indian child.

In the present case, nothing in the record gives us reason to doubt the accuracy of mother's or father's denial of a tribal affiliation. Each of the parents unequivocally denied Indian ancestry, and mother has not identified any evidence in the record that would support an inference that she or father might unknowingly be a member of an Indian tribe. (See *Ezequiel G*., *supra*, 81 Cal.App.5th at p. 1015.) Indeed, the evidence is to the contrary. Both mother and father were raised primarily by their own parents and lived with them intermittently in the period between Anthony's birth and detention. Maternal and paternal relatives were present at the detention hearing when the juvenile court made ICWA findings, and no relative contradicted the parents' denials of Indian ancestry. Further, both parents remained in close contact with their families throughout these proceedings: Father lived with his mother (the paternal grandmother) at the time of the detention hearing, and the maternal grandmother and great-grandparents monitored mother's visits with Anthony. The possibility that either parent might unknowingly be a member of an Indian tribe thus appears trivially small. The juvenile court therefore did not abuse its discretion by concluding that DCFS conducted an adequate ICWA inquiry as to both parents.

For all the same reasons, even if the juvenile court erred by finding DCFS's inquiry adequate, that error was not prejudicial because it is not "reasonably probable that an agency's error in not conducting a proper initial inquiry affected the correctness (that is, the *outcome*) of the juvenile court's ICWA finding." (*In re*

*Dezi C.* (2022) 79 Cal.App.5th 769, 781, italics added, review granted Sept. 21, 2022, S275578.)  As we have said, nothing in the juvenile court record gives us a reason to doubt the accuracy of the parents' denials that they or Anthony were members of or eligible for membership in an Indian tribe, and mother has not made a proffer on appeal that she or father has Indian heritage. No remand therefore is warranted.

## DISPOSITION

The May 27, 2021 orders denying mother's section 388 petition and terminating parental rights are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

I concur:

EGERTON, J.

**RICHARDSON (ANNE K.), J., Concurring and Dissenting**.

I agree that the juvenile court's disposition of the modification petition was not an abuse of discretion. I respectfully disagree with the majority's conclusions that the juvenile court applied the correct legal standard as to the beneficial relationship exception (Welf. & Inst. Code,[1] § 366.26), and that substantial evidence supported the finding that DCFS's ICWA inquiry was adequate. I would therefore reverse the juvenile court's termination order and, on account of that disposition, also vacate the finding that ICWA does not apply, with instruction to the juvenile court to order DCFS to comply with its duties under ICWA.

## DISCUSSION

## I.     Beneficial relationship exception

Turning to the beneficial relationship question first, the majority recognizes that, in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*), our Supreme Court resolved several open questions as to how the beneficial relationship test is applied. (Maj. opn. *ante*, at pp. 19–23.) I agree with the majority's conclusion that the juvenile court erred with respect to the first prong of the three-step *Caden C.* analysis because mother maintained consistent visitation. (Maj. opn. *ante*, at pp. 21–22.) I part ways, however, with respect to the majority's treatment of *Caden C.*'s second prong. I agree with mother that the juvenile court improperly focused on her inability to overcome her domestic violence relationship and that she had not occupied a parental

---

[1] All undesignated statutory references are to the Welfare and Institutions Code.

1

role in Anthony's life, rather than focusing on the nature of her bond with Anthony.  Because the application of an incorrect legal standard prejudiced mother, the matter should be returned to the juvenile court to reconsider the exception's applicability with the benefit of *Caden C.*

The second prong of the beneficial relationship analysis requires that the parent show that the child had a "substantial, positive, emotional attachment" to them.  (*Caden C.*, *supra*, 11 Cal.5th at p. 636.)  "[T]he focus is the child[,]" with attention to " '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' "  (*Id.* at p. 632.)

In *Caden C.*, *supra*, 11 Cal.5th at page 637, our Supreme Court clarified that a parent's failure to make "sufficient progress in addressing the problems that led to dependency" is not a "categorical bar to applying the exception."  Because a section 366.26 hearing "all but presupposes that the parent has not been successful" in their case plan, a contrary approach would "effectively write the exception out of the statute."  (*Ibid.*)  Accordingly, a parent's struggles are relevant only insofar as they bear upon the fundamental inquiry posed by the exception, i.e., the parent's relationship with the child.  (*Id.* at pp. 637–638.)

Additionally, courts are not to "compar[e] the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s)."  (*Caden C.*, *supra*, 11 Cal.5th at p. 634.)  Thus, while it is true as the majority notes that *Caden C.* did not use the term "parental role" and did not prohibit an evaluation of the same (maj. opn. *ante*, at pp. 22–23), it certainly did set limits on its use.  (*Caden C.*, at p. 634 ["courts should not look to

2

whether the parent can provide a home for the child; the question is just whether losing the relationship with the parent would harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home"].)  Thus, "problems arise when juvenile courts use the phrase 'parental role' without explaining which meaning(s) they impart to it." (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 319 (*Katherine J.*); see *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 211 [best practice is to not use " 'parental role' "].)  However, a court adequately explains the phrase's use when it relies upon evidence that a parent's actions "consistently destabilize[ ]" the parent-child relationship. (*Katherine J.*, at pp. 319–320.)

Before the Supreme Court decision in *Caden C.*, courts of appeal applied different versions of the parental benefit test that generally included the requirement that the relationship between the child and the parent must be "parental" without any of the above nuance.  (*In re Caden C.* (2019) 34 Cal.App.5th 87, 105 ["Of necessity, however, the relationship at issue must be parental. 'No matter how loving and frequent the contact, and notwithstanding the existence of an "emotional bond" with the child, "the parents must show that they occupy 'a parental role' in the child's life" ' "], revd. (2021) 11 Cal.5th 614; *In re I.W.* (2009) 180 Cal.App.4th 1517, 1528 [same].)  Indeed, several appellate decisions went on to say that such a role " 'characteristically aris[es] from day-to-day interaction, companionship and shared experiences[,]' " although "day-to-day contact is not always required." (*In re Caden C.*, *supra*, 34 Cal.App.5th at p. 105.)

I think it is clear that the trial court used an incorrect legal standard in deciding the parental benefit exception, where the closing arguments and comments of the court reflect the elements

3

of a pre-Supreme Court *Caden C.* analysis rather than focusing on the relationship between parent and child; hardly surprising since the hearing took place on the very day the decision was announced.

Here, during closing arguments at the section 366.26 hearing, the focus of argument was not on Anthony's emotional bond with mother, but whether mother occupied a parental role in Anthony's life by serving as his primary caretaker. DCFS's counsel repeatedly suggested that mother's showing was insufficient because she had not occupied a parental role. DCFS cited a pre-*Caden C.* precedent to argue that because mother was "unable to meet the child's need[s]," this was not an "extraordinary case [where] preservation of parental rights will prevail over the preference of adoption." (*In re K.P.* (2012) 203 Cal.App.4th 614, 621.)[2] Elaborating, counsel concluded by contrasting mother to Anthony's caregiver, Leticia, who Anthony "look[ed] to" as "responsible for his day-to-day needs, for taking him to school, for helping him with his homework, for attending to medical [and] mental health issues, and any other issues. [She] holds the place of the mother and the primary caretaker for Anthony."[3] Similarly, Anthony's counsel asserted that mother

---

[2] Notably, the *Caden C.* court expressly disavowed the precise case that *K.P.* cited in support of this proposition, *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350, while concluding that a parent need not demonstrate a "compelling reason" to invoke the exception. (*Caden C., supra,* 11 Cal.5th at p. 636 & fn. 5.)

[3] By doing so, DCFS engaged in precisely the kind of "contest of who would be the better custodial caregiver" that the

4

did not meet her burden because a beneficial relationship "need[ed] to arise from a day-to-day interaction from having some shared experiences" and mother was "not there to help [Anthony] get ready in the morning" or "tuck him in every night."

The court's oral findings reflect that it was persuaded by these arguments. Over five pages of transcript, the court referenced mother's lack of a parental role at least four times. It expressly conveyed its agreement with Anthony's counsel that mother was not "acting in the role of a parent" because she lacked "daily contact." Later restating its conclusions, the court reasoned that mother had not acted in a parental role given that she had physical custody of Anthony for "probably less than 50 percent" of his life.[4]

---

court in *Caden C.* held was "decidedly not" the purpose of a section 366.26 hearing. (*Caden C., supra,* 11 Cal.5th at p. 634.)

[4] Relatedly, the juvenile court's faulting mother for not making enough progress despite several years of dependency proceedings (i.e., referencing time as a relevant factor) was also improper. While parents are only afforded a limited amount of time to *reunify* (*In re Celine R.* (2003) 31 Cal.4th 45, 52), the parent-child relationship often precedes the dependency (as here), and that relationship may benefit the child regardless of the length of the proceedings. As our Supreme Court has explained, "the question before the court [at the section 366.26 hearing] is decidedly not whether the parent may resume custody of the child." (*Caden C., supra*, 11 Cal.5th at p. 630; see *id.* at p. 638 [parent's continuing struggles are not relevant because they might affect ability to regain custody].) Thus, the court's reference to mother's inability to sever ties with father, get unmonitored visits, or complete programming in a timely fashion did not, as DCFS asserts, demonstrate it adequately considered

"When a trial court applies the wrong legal standard, a remand for further proceedings is certainly appropriate if an appellate court announces a new legal standard and it is unclear from the record whether the trial court would have reached the same result had it not lacked appellate guidance." (*In re J.R.* (2022) 82 Cal.App.5th 526, 532.)[5]  Thus, I agree with those courts that have reversed juvenile court rulings that were entered before *Caden C.* was decided "when the evidence adduced at the section 366.26 hearing could have supported application of the beneficial relationship exception had the juvenile court had the benefit of that decision when it ruled." (*Ibid.*)

I believe the evidence here meets that standard.[6]  The reports entered into evidence at the section 366.26 hearing

---

the parent-child bond, but illuminated the shortcomings in its analysis.

[5] As a threshold matter, most courts have doubted the applicability of harmless error analysis in this context, reasoning that the exception is a discretionary determination which must be made by "the juvenile court . . . in the first instance." (*In re D.M.* (2021) 71 Cal.App.5th 261, 271; see, e.g., *In re M.G.* (2022) 80 Cal.App.5th 836, 852; *In re J.D.* (2021) 70 Cal.App.5th 833, 865 (*J.D.*); *In re B.D.* (2021) 66 Cal.App.5th 1218, 1231.)  Because an appeals court is ill-suited to speculate as to how the trial court might have exercised its discretion in light of *Caden C.*, many courts reason that reversal is necessary irrespective of harmless error.  (*In re D.M.*, at p. 271.)

[6] Preliminarily, it bears noting that the court denied mother's requests to present additional evidence in the form of a bonding study and further testimony from maternal grandmother (see *Caden C., supra*, 11 Cal.5th at p. 633, fn. 4 [recommending

contained several third-party accounts of the mother-child bond which, applying the relevant factors (*Caden C.*, *supra*, 11 Cal.5th at p. 632), could have sufficed to demonstrate a "substantial, positive, [and] emotional attachment." (*Id.* at p. 636.)[7]

Those reports reflected that at the time of the May 2021 hearing, Anthony was in mother's custody for over half of his nearly six-year life, from his June 2015 birth to the March 2017 removal (21 months), and again from December 2018 to the second removal in March 2020 (15 months). Courts are more likely to find a beneficial relationship where a parent has acted as a primary caretaker for at least half of the child's life. (See, e.g., *J.D.*, *supra*, 70 Cal.App.5th at p. 855 [finding a beneficial relationship where the child "had lived with [his] mother for just over half of his life"]; *In re S.B.* (2008) 164 Cal.App.4th 289, 298–299 [finding a beneficial relationship where the father of a five-year-old child was the child's caregiver for three years]; *In re Amber M.* (2002) 103 Cal.App.4th 681, 689 [finding a beneficial relationship where two of the mother's three children had been in

---

trial courts "seriously consider, where requested and appropriate, allowing for a bonding study or other relevant expert testimony"]), evidence which, if available, may have furnished additional relevant information about the parent-child bond.

[7] Because credibility is a question for the trier of fact (*In re Precious D.* (2010) 189 Cal.App.4th 1251, 1258–1259), I defer to the juvenile court's credibility determinations as to mother's testimony.

her care for most of their lives].)[8]  They are also more likely to find a beneficial relationship where, as here, the child has sufficiently advanced beyond infancy to understand the concept of a biological parent and develop an attachment to them.  (See *In re Angel B.* (2002) 97 Cal.App.4th 454, 468 [exception inapplicable because child's infancy meant he was not old enough to understand the idea of a biological parent].)

Further, three maternal relatives—whose reports that father was abusing mother (leading to Anthony's first removal) and that father was hiding in mother's closet (leading to Anthony's second removal) showed they had no difficulty being candid with DCFS—described mother's positive connection with Anthony with specificity.  They recounted that, during weekly day-long visits over the year-plus period following Anthony's second removal, Anthony was always happy to see mother and tearful when saying goodbye.  Anthony openly conveyed his love for mother, hugging and kissing her and stating as much.  Mother appropriately met Anthony's needs, whether it involved cooking, bathing, dressing, grooming, or helping him with school work.  At the end of visits, Anthony pleaded with the family to let him stay.

Indeed, the juvenile court and social worker stated several times—including as recently as the previous year—that Anthony and mother had bonded, and there was no reason to believe their bond had evaporated over those intervening months, during which mother consistently visited.  Earlier reports referenced

---

[8] The trial court appeared to misapprehend the time Anthony spent in mother's custody, stating that it was "for probably less than 50 percent of his [life]."

8

Anthony's calling for mother as he was transported to caregiver's home, as well as his statements that he liked it in mother's home and wanted to stay.[9]  The section 366.26 report also documented Anthony's developmental and educational progress, despite the deficits with which he was diagnosed in 2017.  Since much of this progress occurred at least in part during Anthony's time in mother's custody, mother's active role in his education cannot be discounted as a contributing factor, further reflecting her efforts to meet Anthony's needs.  The section 366.26 report also detailed that mother adequately addressed Anthony's medical and dental needs.

As such, at least *some* evidence supported the exception's application.  (*In re J.R.*, *supra*, 82 Cal.App.5th at p. 533.)  That mother—a young woman struggling to overcome a difficult

[9] Anthony's statement that he wanted to stay with Leticia (maj. opn. *ante*, at p. 26) does not preclude a significant positive attachment with mother.  (*J.D.*, *supra*, 70 Cal.App.5th at p. 859 ["A child's emotional attachments are not a zero-sum game"].)  Indeed, several cases cited favorably by the court in *Caden C.*, *supra*, 11 Cal.5th at pages 632 to 634, 638, illustrate that a parent need not prove that the child's attachment to them was their primary bond.  (*In re S.B.*, *supra*, 164 Cal.App.4th at p. 300 ["requiring the parent of a child removed from parental custody to prove the child has a 'primary attachment' to the parent" is not "reasonable"]; see, e.g., *In re Scott B.* (2010) 188 Cal.App.4th 452, 473 [reversing order terminating parental rights, and noting minor "clearly needs both of his mothers—his biological mother and his foster mother"].)  Moreover, Anthony was confused by the concept of adoption, and never asked about his "feelings towards his mother, which, at least in the context of the beneficial relationship exception, was equally or more important." (*J.D.,* at p. 860 [faulting child's attorney and social worker for asking only where child wished to live].)

9

upbringing and an abusive relationship—had imperfect compliance with her case plan was not unexpected. (Cf. *In re J.M.* (2020) 50 Cal.App.5th 833, 848 ["The goal of dependency court proceedings is not to engineer perfect parents."].) But given her dedication to preserving her strong bond with Anthony, I am unpersuaded that a trial court, considering the actual evidence before it and the proper factors, might not have reached a different outcome.

The majority acknowledges some evidence of a bond (maj. opn. *ante*, at pp. 26–27) but declines to find error because, in one instance when the court said mother did not act in a parental role, it also "noted that mother had exposed Anthony to repeated domestic violence incidents between the parents, including father stealing mother's car keys, breaking her windshield, and removing her window screens." (Maj. opn. *ante*, at p. 24.) The court also noted that being asked to lie about father's presence in mother's closet was "a lot for a little kid." (*Id.* at p. 25.) Analogizing this case to *Katherine J.*, *supra*, 75 Cal.App.5th at pages 319 to 320 and *In re A.L.* (2022) 73 Cal.App.5th 1131, 1157, the majority concludes that the court did not err in considering "the effect on Anthony of the domestic violence" (maj. opn. *ante*, at p. 25, fn. 6) or his "likely continued exposure to domestic violence if his visits . . . were to continue." (Maj. opn. *ante*, at p. 25.)

I do not believe the record and the cases the majority invokes support these conclusions. In my view, while a juvenile court may properly decline to find a substantial, positive emotional attachment when presented with actual evidence that a parent-child relationship has been materially and adversely affected by the parent's ongoing struggles with domestic violence,

10

it cannot proceed by assuming that any such struggles have had such an effect.

Thus, in *Katherine J.*, because there was "evidence of [the child] telling others that she was 'afraid' of father and that she did not want to speak to him" and that she was "traumatized" after witnessing her father violently attack her grandmother, the Court of Appeal had no difficulty concluding the father's misdeeds had a "consistently destabiliz[ing]" effect on the parent-child relationship.  (*Katherine J.*, *supra,* 75 Cal.App.5th at p. 321; see *id.* at p. 313 [describing effects].)  In *In re A.L.*, *supra*, 73 Cal.App.5th at page 1159, even though a social worker had opined that father's substance abuse was continuing to "negatively impact[]" the parent-child relationship, the juvenile court concluded that "there *was* a beneficial relationship that existed between father and the minor."  (*In re A.L.*, at p. 1161.)[10]

Similarly, in *Caden C.*, there was evidence that mother, as a product of her struggles with mental health, "sought to undermine at least some of Caden's foster placements."  (*Caden C.*, *supra*, 11 Cal.5th at p. 637.)  Though mother's struggles "*could* certainly have had a negative effect on [Caden]" (*ibid.*, italics added), they were not, on their own, sufficient to bar the exception (*id.* at p. 642).  Because the Court of Appeal did not rely on "*evidence* [that] showed Mother's [struggles] *affected* whether her relationship with Caden was beneficial," the Supreme Court

---

[10] However, in light of this evidence, the *A.L.* court affirmed the refusal to apply the exception at the third step of the *Caden C.* analysis.  (*In re A.L.*, *supra*, 73 Cal.App.5th at pp. 1161–1162.)

11

remanded for application of the correct legal standard. (*Ibid.*, italics added [court must "connect" struggles to child's welfare].)[11]

As these and several other post-*Caden C.* decisions reflect, a court's reliance upon a parent's struggles must be evidence-based—not speculative or conclusory—and reflect a materially adverse effect on the parent-child bond. (See, e.g., *In re B.D.*, *supra*, 66 Cal.App.5th at p. 1228 [failure to provide evidentiary foundation as "*how* the parents' continued [struggles] impacted the nature of the parent-child relationship" violated *Caden C.* (italics added)]; *J.D.*, *supra*, 70 Cal.App.5th at p. 863 [similar, where there was no "evidence in the record" suggesting that mother's struggles had "*lasting* impact" on the child].) As a court of review, we are not to consider any "[o]ne section of the dependency law . . . in a vacuum[,]" but to "harmonize[ ]" the "whole system of law" to ensure that the parent is afforded "due process and fundamental fairness while also accommodating the child's right to stability and permanency." (*In re Marilyn H.* (1993) 5 Cal.4th 295, 307.) In the context of the beneficial relationship application, "proper consideration of the factors deemed relevant by our dependency scheme is [a] vital" part of protecting the important interests at stake. (*J.D.*, at p. 840.) In

---

[11] *Caden C.*'s discussion of this principle also took place in its explanation of the third step of the framework. (See *Caden C.*, *supra,* 11 Cal.5th at p. 642 [conclusion that child had beneficial relationship (i.e., met the second prong) was not " 'seriously disputed' "]; see also *id.* at p. 634.) Because the majority declines to address the third step and frames its discussion of this principle as relevant to the second step (maj. opn. *ante*, at pp. 26–27, 29, fn. 7), I do so as well. (*Katherine J.*, *supra*, 75 Cal.App.5th at p. 317, fn. 7 [second and third steps "significantly overlap"].)

12

my view, an evidence-based approach is vital to "preserv[ing] the child's right to the relationship *even when* the child cannot safely live with that parent," without "judgment about the parent's problems." (*Caden C.*, *supra*, 11 Cal.5th at p. 643, italics added.)

Here, assuming for argument's sake that Anthony was "exposed" to domestic violence (maj. opn. *ante*, at p. 25),[12] the record is devoid of evidence that such exposure negatively affected Anthony's bond with mother. Indeed, this case exemplifies the necessity of such evidence: a child who has

_____

[12] The majority cites no examples of Anthony witnessing any of father's outbursts, and mistakenly asserts that the trial court concluded that he did. In fact, the trial court reasoned: "There was other times during that period of time when Anthony was living with mom that her car keys were stolen, windows broken in, screens taken off her apartment, and [that father is] hiding in a closet, refusing to come out. That is not acting like a parent that's protective." It is noteworthy that the record does contain several examples of mother trying to limit the effects of such incidents, including calling the police, requesting restraining orders, and taking Anthony to maternal grandmother's home when she suspected father might cause trouble. While I recognize the "serious threat to the well-being and safety of children in the home" that domestic violence poses, the lack of evidence that Anthony was "physically harmed" or "witness[ed] any such violence" underscores the extent of assumptions required for the majority's conclusions. (*In re J.M.*, *supra*, 50 Cal.App.5th at p. 848 [lack of such evidence even though mother "initially struggled to stay away from [f]ather" favors parent in request for modification context].) Nonetheless, because the most pertinent question is the *effect* of the parent's struggles on the parent-child bond (*Caden C.*, *supra*, 11 Cal.5th at pp. 637–638), my analysis assumes that Anthony witnessed at least some of these incidents.

previously witnessed his mother being abused can certainly remain deeply bonded to her such that termination is not in his best interest.

I would instead conclude that the juvenile court's several express findings that mother was not acting in a parental role and had not overcome her struggles with domestic violence, without tying them to their effect on the parent-child bond, demonstrate that the court considered factors which *Caden C.* has clarified as inappropriate in determining whether the parental-benefit exception applies.  (See *Caden C.*, *supra*, 11 Cal.5th at pp. 632–633; *In re B.D.*, *supra*, 66 Cal.App.5th at pp. 1230–1231 [reversing for misapplication of *Caden C.*]; see also *In re Charlisse C.* (2008) 45 Cal.4th 145, 159 [a "disposition that rests on an error of law constitutes an abuse of discretion"].)

Because the juvenile court did not have the guidance of *Caden C.* when it rendered its decision (maj. opn. *ante*, at p. 21 & fn. 5), it should be afforded another opportunity to exercise its discretion in light of that decision.  This is not a case where mother had a full opportunity to present evidence and where "no evidence . . . could support a favorable finding for [her]," and thus the error cannot be excused as harmless.  (*In re J.R.*, *supra*, 82 Cal.App.5th at p. 533.)

For all these reasons, I would reverse the order terminating mother's parental rights and remand for a new section 366.26 hearing using the *Caden C.* standard.

## II.    ICWA

Finally, I agree with mother's further contention that DCFS failed to ask extended relatives whether Anthony is or may be an Indian child as required under section 224.2, subdivision (b), and the juvenile court erroneously concluded ICWA does not

14

apply. Because I have already concluded that the termination order must be reversed, I would also vacate the ICWA determination and order ICWA compliance on remand.

The language of the governing statute provides that: "Inquiry includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, *extended family members*, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b), italics added.) There may be times when it is not feasible to make contact with all of the persons listed in the code: when they refuse to respond, when no contact information is provided, and certainly if there are no such relevant persons or such persons are deceased. In this case, however, there were readily available extended family members, including maternal grandmother, maternal great grandmother, paternal grandmother, and maternal and paternal aunts, that could have been interviewed about the children's possible Indian ancestry, but DCFS did not attempt any such inquiry. Under these circumstances, there was no substantial evidence to support a finding that DCFS's inquiry was proper, adequate, and duly diligent.

Where a juvenile court continues to have jurisdiction over the child, the proper remedy is to vacate the finding that ICWA does not apply, and to remand for compliance with the inquiry, and if applicable, notice requirements of ICWA and related California law.  (See *In re Dominick D.* (2022) 82 Cal.App.5th 560, 567 ["ICWA inquiry and notice errors do not warrant reversal of the juvenile court's jurisdictional or dispositional findings and orders other than the ICWA finding itself"].)  Because reversal of the termination order is, in my view, necessary, I would also vacate the finding that ICWA does not apply, and direct the juvenile court to order DCFS to comply with its duties under ICWA.

RICHARDSON (ANNE K.), J.*

---

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

16